UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

325 EAST 72ND STREET CORP., and                                 :
315 EAST 72ND STREET OWNERS CORP.,
                                                                :
                                        Plaintiffs,
                                                                :
        - against -
                                                                :
UNITED STATES DEPARTMENT OF
TRANSPORTATION, MARY E. PETERS, in                              :
her capacity as Secretary of the United States
Department of Transportation, THE FEDERAL                      :
TRANSIT ADMINISTRATION, JAMES S. SIMPSON,
in his capacity as Administrator of the Federal Transit        :
Administration, THE METROPOLITAN
TRANSPORTATION AUTHORITY, H. DALE                              :
HEMMERDINGER, in his capacity as Chairman of the
Metropolitan Transportation Authority, THE NEW                 :
YORK CITY TRANSIT AUTHORITY, HOWARD H.
ROBERTS, JR., in his capacity as the President of the          :
New York City Transit Authority, and THE
METROPOLITAN TRANSPORTATION AUTHORITY                          :
CAPITAL CONSTRUCTION COMPANY,
                                                                :
                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x



Civ.

E C F  CASE

COMPLAINT

08 CIV. 1127

JUDGE LYNCH

        Plaintiffs 325 East 72nd Street Corp. and 315 East 72nd Street Owners Corp.

(collectively, "Plaintiffs"), through their attorneys, Zarin & Steinmetz and Anderson, Kill &

Olick, P.C., respectfully allege, as follows:

## SUMMARY OF ACTION

        1.      More than three (3) years after the purported completion of the

environmental review of a proposal to construct a subway connecting upper and lower

Manhattan along Second Avenue (the "Second Avenue Subway Project" or the "Project"), the

Metropolitan Transportation Authority (the "MTA") announced a substantial design change to

the Project, eliminating a station entrance within a corner building located at 305 East 72nd Street, and replacing it with two bizarre, unprecedented sidewalk entrances and exits located mid-block on the north side of 72nd street east of 2nd Avenue, directly in front of and in immediate proximity to the entrances of Plaintiffs' residential buildings (the "Station Relocation" or "Design Change").  The MTA, with or without the approval or acquiescence of the Federal Transit Administration (the "FTA"), made this decision absent any public environmental review, or consultation with or advance notice to the interested and affected parties and governmental agencies.  Such actions are in direct violation of the spirit and strict requirements of the National Environmental Policy Act of 1969 ("NEPA") and the New York State Environmental Quality Review Act ("SEQRA").

2.      Upon information and belief, over 30,000 pedestrians are projected to enter and exit the relocated subway station daily.

3.      The Station Relocation would divert literally tens of thousands of commuters from the previously approved commercial corner location – which has the capability to disperse adequately the pedestrian traffic – to escalators and stairs situated mid-block in front of Plaintiffs' buildings.  This would create unprecedented and substantial impacts to an area with a completely different residential character than the normal commercial intersections where most subway stations in New York City are located.

4.      Even the MTA admits that these changes to the Project are "important" and "notable." Yet, the determination to relocate these subway entrances was finalized in complete secrecy, without the MTA or FTA undertaking the most minimal environmental review or disclosure, or complying with any of their fundamental statutory mandates under NEPA and SEQRA.

5.     The MTA announced the Design Change during a presentation at a Community Board 8 meeting on September 25, 2007 – which was just five (5) days after the MTA represented to the public at a public hearing under New York's Eminent Domain Procedure Law ("EDPL") for the Project that the 72nd Street northeast station entrance would be located at the original location within the corner building at 305 East 72nd Street.

6.     In fact, when representatives from Plaintiff 325 East 72nd Street Corp. attended the required EDPL public hearing held on September 20, 2007, they were advised by an MTA representative that the proposed condemnation "did not concern their building," and that this was simply "something to be aware of."  They immediately went home.

7.     Yet, five days later, Defendants made public their decision to move the 72nd Street northeast station entrance from the corner to immediately in front of Plaintiffs' buildings.

8.     The rendering on the last page of the MTA's September 25, 2007 presentation reveals that the result would look something like placing a "soccer field" mid-block on the sidewalk in front of Plaintiffs' buildings, only with the "goals" facing the wrong direction, and with over 30,000 players and fans expected to swarm over the field each day.  (See MTA's Presentation entitled "Second Avenue Subway Project, Community Board 8: Second Avenue Subway Task Force," September 25, 2007 (the "Presentation"), a copy of which is annexed hereto as Exhibit "A").

9.     At no time throughout the nine (9) year environmental review for the Project did the MTA ever mention, discuss, analyze or undertake any of the requisite "hard look" studies related to constructing and relocating the 72nd Street northeast entrance mid-block in the

center of the sidewalk in this residential Upper East Side neighborhood. Such mid-block locations have little or no precedent in New York City.

10.     The extent to which the FTA – as the federal lead agency under NEPA – has any knowledge about the Design Change remains unclear. The FTA has not issued any findings, studies, determinations, or any other documentation indicating it knows about or has adequately reviewed the potential environmental consequences of the Design Change, as well as meaningfully studied any feasible alternatives or necessary mitigation, as required under NEPA and its implementing regulations. The FTA has completely failed to fulfill its statutory duties as Lead Agency in this matter.

11.     If the MTA and FTA had undertook the most minimal environmental review, there is no question that they would have had to conclude that the Station Relocation would result in potential significant environmental impacts that were not previously studied in the prior 2004 environmental review of the Project, including: (i) the impacts resulting from the enormous and completely incompatible increase in pedestrian traffic and disturbances that would occur from the projected 30,000 passengers utilizing the relocated, mid-block station entrances each day in front of Plaintiffs' buildings; (ii) the potential vehicular traffic impacts on 72nd Street related to the 6-foot "bump-out" of the sidewalk on the north side of 72nd Street, which purportedly is required to create sufficient room for the sidewalk entrances; (iii) the anticipated dramatic change in the character of this relatively quiet, 72nd Street residential community; (iv) the various potential impacts resulting from the projected years of construction of the sidewalk entrances; and (v) numerous other significant potential impacts.

12.     None of those impacts were analyzed or studied by the FTA or MTA as part of a supplemental environmental review prior to announcing and finalizing the Design

4

Change, in clear violation of the Federal Administrative Procedure Act ("APA"), NEPA, and SEQRA.

13.    The FTA and MTA also violated the APA, NEPA and SEQRA by failing to evaluate any potentially feasible alternatives to the Design Change in an open and transparent manner.  There may be other viable alternatives, including, the possibility of returning to the entrance at 305 East 72nd Street or utilizing an already existing Transit Easement within the premises located at 304-308 East 72nd Street (the southeast corner of 2nd Avenue) for some or all of the station's functions, which have not been studied fully, if at all.

14.    The Transit Easement granted to NYCT pursuant to the NYC Zoning Resolution was specifically granted for transit use, including, "to provide a connection and means of ingress and egress" to the Second Avenue Subway Project.

15.    If cost savings is the rationale for selecting the Design Change among other alternatives, the public has a right under NEPA to review and comment on any cost-benefit analysis.  That opportunity has not occurred here.

16.    To the extent the FTA and/or the MTA conducted any such studies or analyses of the potential impacts and/or other viable alternatives, those studies were not provided to the public for review and comment, nor were any public hearings held on the Design Change, also in clear violation of the APA, NEPA and SEQRA.

17.    Just last week, the MTA sent a three page letter to NYC Councilmember Jessica Lappin concerning its so-called "hard look" of the potential new impacts caused by relocating the station entrances and exits.  (See Letter from the MTA to NYC Councilmember Jessica Lappin, dated January 23, 2008 (the "MTA Letter"), a copy of which is annexed hereto as Exhibit "B").

18.    Upon information and belief, this after-the-fact letter constitutes the entire "record" produced by the MTA to date concerning its determination to relocate the subway entrance to the subject locations.

19.    In the MTA Letter, the MTA stated publicly for the first time that the agency "found that the change does not result in any significant pedestrian impacts. A new EIS is not required." (Id.).

20.    As such, the MTA summarily dismissed the need for a supplemental environmental review without revealing or undertaking any of the requisite studies or supplying any of the supporting documentation it purportedly completed to the affected public or other government agencies for their review and comment as required by law.

21.    It is startling that the MTA Letter is the only public document setting forth the MTA's important decision not to prepare a supplemental environmental impact statement in connection with the Station Relocation. This Letter, lacking any data or analysis, and prepared well after the MTA finalized the Design Change and only in response to a January 10, 2008 letter from Councilmember Lappin to the MTA, does not come close to satisfying the "hard look" standard under NEPA or SEQRA.

22.    The MTA's "behind closed doors" approach to critical analyses and decision-making under NEPA and SEQRA flies in the face of the spirit and mandates of these important environmental review statutes.

23.    The public and the relevant governmental decision-makers have not been provided with any of the necessary information required to allow them to make a rational determination as to whether swapping a commercial station entrance inside a corner building footprint – the approach favored by the MTA's own station design criteria – with two bizarre and

completely abnormal mid-block, sidewalk entrances located adjacent to the front of active residential buildings should be pursued in light of the relevant environmental impacts.

24.    By failing to supplement their environmental review of the Second Avenue Subway Project, by depriving affected parties and other governmental agencies an opportunity to study meaningfully the environmental impacts that might result from construction of the Station Relocation, by not considering other viable alternatives or possible mitigation measures in an open and deliberative process, and by failing to explicate their course of inquiry, analysis and reasoning, the FTA and MTA have failed to carry out their most fundamental responsibilities under NEPA, SEQRA, and their implementing regulations.

25.    The MTA has also violated the EDPL in its quest to rush to acquire certain property interests for the Station Relocation.  Defendants' illegal actions include their: (i) failure to comply with the EDPL's notice and hearing requirements; (ii) failure to establish that their proposed acquisitions further a "public purpose" pursuant to the EDPL; and (iii) failure to conduct the requisite environmental review as required under SEQRA before making a determination to condemn property.

26.    To be clear, Plaintiffs do not challenge the overall public benefit of the Second Avenue Subway Project.  Nor are they opposed to a subway stop at the corner of 72nd Street and 2nd Avenue.  This lawsuit concerns the siting of a subway station entrance, and all its associated adverse impacts, directly in front of Plaintiffs' residential buildings without any of the most minimally required statutory environmental reviews.

27.    In light of the foregoing, Defendants, their agents, and all involved and related parties must be enjoined, as a matter of law, from undertaking: (i) any actions related to the condemnation of property interests and construction of the Station Relocation; and (ii) any

other actions related to the Second Avenue Subway Project as a whole, which are dependant upon or linked to the ultimate location or construction of the 72nd Street northeast station entrance at its current mid-block location under the Design Change, until Defendants fulfill all their essential obligations as mandated under NEPA, SEQRA, EDPL and their governing regulations, and undertake the thorough supplemental environmental review required by law of the potential significant environmental impacts associated with this substantial change in the Second Avenue Subway Project.

<u>THE PARTIES</u>

28.    Plaintiff 325 East 72nd Street Corp. is the owner of fee title to the premises and building located at 325 East 72nd Street, New York, New York, otherwise known as Block 1447/Lot 13 on the New York City Tax Map ("Plaintiff 325"), which premises and building are in immediate proximity to where the sidewalk entrances under the Design Change would be relocated, and which premises are subject to the proposed condemnation proceeding initiated by the MTA pursuant to the EDPL.

29.    Plaintiff 315 East 72nd Street Owners Corp. is the owner of fee title to the premises and building located at 315 East 72nd Street, New York, New York, otherwise known as Block 1447/Lot 9 on the New York City Tax Map ("Plaintiff 315"), which premises and building immediately abut where the sidewalk entrances under the Design Change would be located, and which premises are also subject to the proposed condemnation proceeding initiated by the MTA pursuant to the EDPL.

30.    Plaintiffs have standing to bring this action.

31.     Plaintiffs have the requisite personal stake in the outcome of this action upon which to invoke Federal Court jurisdiction and to trigger the exercise of the Court's remedial powers.

32.     Plaintiffs have and will suffer threatened and/or actual injury as a direct consequence of Defendants' failure to carry out their legal responsibilities, including, but not limited to, their failure to conduct an adequate environmental review under NEPA, SEQRA, as well as the EDPL.

33.     The threatened and/or actual injury at issue is also a consequence, in part, of Defendants' failure to fulfill their obligations under NEPA, 42 U.S.C. Section 4332, whereby they are required to prepare a detailed statement of the environmental impact of all aspects of a proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, alternatives to the proposed action, the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitments of resources, which would be involved in the proposed action should it be implemented.

34.     The threatened and/or actual injury at issue is also a consequence, in part, of Defendants' failure under 40 C.F.R. § 1502.9 and 23 C.F.R. § 771.130 to supplement the 2004 Final Environmental Impact Statement for the Project prior to announcing their decision to make a substantial change to the Project by relocating the northeast station entrance at 72nd Street from the corner to mid-block, which change would result in potential new significant environmental impacts that were not evaluated or even identified in the Final Environmental Impact Statement.

35.     Plaintiffs' threatened and/or actual injury is based upon the immediate proximity of their properties to the proposed Design Change.

36.    Avoidance or minimization of Plaintiffs' threatened and/or actual injury alleged herein is an interest within the zone of interests intended to be protected by NEPA, including, in particular, 42 U.S.C. Section 4332.

37.    As parties subject to condemnation by the MTA, and parties given notice of the September 20, 2007 Public Hearing conducted by the MTA pursuant to the EDPL, Plaintiffs have standing to contest the procedural regularity of that Hearing and the substantive adequacy of the Determination and Findings issued therafter.

38.    As cooperative corporations whose tenant-shareholders, individually and collectively, pay real estate taxes annually in excess of $1,000.00 per tenant-shareholder, Plaintiffs have standing to maintain claims against Defendants under NY General Municipal Law Section 51.

39.    Defendants' failure to perform their environmental review responsibilities would, if uncorrected through judicial intervention, injure the use, aesthetics, and environmental well-being of Plaintiffs' residential properties, the surrounding properties and sites, and the public uses thereof.

40.    The threatened and/or actual injury alleged herein will likely be redressed by a favorable decision because Defendants will be compelled to openly investigate and study in an open and deliberative public process the environmental impacts of the proposed Design Change as NEPA requires, including, by preparing a Supplemental Environmental Impact Statement, and to avoid or mitigate the adverse impacts associated with the proposed Design Change, again, in an open and deliberative process.

41.    Ultimately, said study and investigation, including a Supplemental Environmental Impact Statement, will reveal the significant environmental impacts that the

proposed Design Change or Station Relocation would cause, and Defendants will likely be compelled to abandon the proposed Design Change or portions thereof for a less harmful alternative.

42.     Defendant United States Department of Transportation ("DOT") is an Executive Branch Department of the United States Government, pursuant to 49 U.S.C. Section 102.  DOT has its principal Offices at 400 Seventh Street, S.W., Washington, D.C. 20590.  DOT is ultimately responsible for the actions of the FTA.

43.     The Honorable Mary E. Peters is the Secretary of the DOT.

44.     Defendant FTA is an administrative agency of the DOT, pursuant to 49 U.S.C. Section 107.  FTA has its principal Offices at 1200 New Jersey Avenue, S.E., Washington, D.C. 20590.  FTA and MTA are acting as joint lead agencies under NEPA to conduct the inadequate environmental review of the Station Relocation, which is the subject of this action.

45.     A lead agency "means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement."  40 C.F.R. § 1508.16.

46.     The Honorable James S. Simpson is the Administrator of the FTA.

47.     Defendant MTA is a public benefit corporation operating pursuant to Article 5, Title 11 of New York State Public Authorities Law.  MTA has its principal Offices at 347 Madison Avenue, New York, New York 10017-3739.  FTA and MTA conducted the inadequate environmental review of the Station Relocation, which is the subject of this action.

48.     The Honorable H. Dale Hemmerdinger is Chairman of the MTA.

49.     Defendant New York City Transit Authority ("NYCT"), is an affiliated agency of the MTA, and a public benefit corporation created by the State of New York.  NYCT

has its principal Offices at 2 Broadway, New York, New York 10004.  NYCT participated and cooperated in the inadequate environmental review that is the subject of this action.

50.    Howard H. Roberts, Jr. is the President of the NYCT.

51.    Defendant MTA Capital Construction Company ("MTA Capital"), was created by the MTA and is a wholly owned subsidiary of the MTA.  MTA Capital has its principal Offices at 2 Broadway, 8th Floor, New York, New York 10004.  MTA Capital is responsible for the management of the Second Avenue Subway Project.

<u>JURISDICTION AND VENUE</u>

52.    Pursuant to 28 U.S.C. Section 1331, this Court has original jurisdiction over this matter because it arises under the laws of the United States, including, the APA and NEPA.

53.    Pursuant to 28 U.S.C. Section 1361, this Court also has original jurisdiction over this matter because Plaintiffs seek relief in the nature of mandamus to compel an officer or employee of the United States or an agency thereof to perform a duty owed to Plaintiffs.

54.    Pursuant to 28 U.S.C. Section 1367, this Court has supplemental jurisdiction over all claims made by Plaintiffs under New York State Law because such claims are so related to claims in this action that are within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

55.    This Court has personal jurisdiction over each and every Defendant in this action because each and every Defendant named herein transacts business within the State of New York.

56.    Pursuant to 28 U.S.C. Section 1391(e), venue in the Southern District of New York is proper because a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred there, and the property that is the subject of this action is situated there.  Venue is also appropriate in the Southern District of New York as all Defendants are subject to personal jurisdiction in the Southern District at the time that this action is being commenced.  28 U.S.C. § 1391.

RELEVANT STATUTORY AND REGULATORY FRAMEWORK

The Federal Administrative Procedure Act

57.    The Court's review of this action is governed by the APA, and, in particular, 5 U.S.C. Section 706.  This statute empowers the Court to "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be," inter alia "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law," or "unsupported by substantial evidence."  5 U.S.C. § 706.

58.    The APA requires Courts to make a searching and careful inquiry into the underlying facts to determine whether an agency's decision to proceed with a proposal was based on a consideration of all the relevant factors, and whether there has been a clear error of judgment.

The National Environmental Policy Act of 1969

59.    Congress enacted NEPA in recognition of "the profound impact of man's activity on the interrelations of all components of the natural environment," including, in particular, "high-density urbanization," as well as "the critical importance of restoring and

maintaining environmental quality to the overall welfare and development of man." 42 U.S.C. § 4331.

60.    In NEPA, Congress "declare[d] that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." Id.

61.    In NEPA, Congress established that "it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources" in order to advance critical goals, including "assur[ing] for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and "preserv[ing] important historic, cultural, and natural aspects of our national heritage." Id.

62.    To effectuate NEPA's salutary purposes, federal agencies are required to prepare, in conjunction with every recommendation or report on proposals for "major Federal actions significantly affecting the quality of the human environment," an environmental impact statement ("EIS") addressing: (i) the environmental impact of the proposed action; (ii) any adverse environmental effects that cannot be avoided should the proposal be implemented; (iii) alternatives to the proposed action; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any

irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.  Id. § 4332.

63.    "[T]he primary purpose of an [EIS] is to serve as an action-forcing device to insure that the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of the Federal Government."  40 C.F.R. § 1502.1.

64.    The procedures described herein relating to the preparation of an EIS are equally applicable to the preparation of a Supplemental EIS ("SEIS"), except that scoping is not required.  This lawsuit primarily concerns Defendants' failure to prepare a Supplemental EIS under NEPA and SEQRA prior to finalizing the Station Relocation.

65.    An EIS, or an SEIS in this case, "shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  Id.

66.    The section of an EIS or SEIS analyzing alternatives is considered "the heart of the environmental impact statement."  Id. § 1502.14.

67.    In the alternatives section, agencies shall, inter alia, "[r]igorously explore and objectively evaluate all reasonable alternatives," "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits," and "[i]nclude appropriate mitigation measures."  Id. § 1502.14(a), (b), (f).

68.    "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  Id. at § 1500.1(b) (emphasis added).

69.    "Agencies shall integrate the NEPA process with other planning <u>at the earliest possible time</u> to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." <u>Id.</u> § 1501.2 (emphasis added).

70.    NEPA's implementing regulations require that a draft EIS ("DEIS") be prepared and circulated for comment, after which a final EIS ("FEIS") must be prepared to respond to comments on the DEIS. <u>See id.</u> §§ 1502.9, 1502.19.

71.    The FTA's process for complying with NEPA is set forth in the joint Federal Highway Administration/Department of Transportation's Environmental Impact and Related Procedures. <u>See</u> 23 C.F.R. §§ 771.101-137.

72.    The FTA's implementing regulations likewise recognize that "[e]arly coordination with appropriate agencies and the public aids in determining the type of environmental document an action requires, the scope of the document, the level of analysis, and related environmental requirements. This involves the exchange of information from the inception of a proposal for action to preparation of the environmental document." <u>Id.</u> § 771.111(a).

73.    The FTA's regulations implementing NEPA mandate that "[a] draft EIS shall be prepared when the [FTA] determines that the action is likely to cause significant impacts on the environment." <u>Id.</u> § 771.123(a).

74.    A Notice of Intent to prepare an EIS must be published in the Federal Register, after which the FTA must initiate a scoping process, which is "used to identify the range of alternatives and impacts and the significant issues to be addressed in the EIS and to achieve the other objectives [concerning scoping] of 40 C.F.R. 1501.7." <u>Id.</u> §§ 771.123 (a), (b).

75.    "The draft EIS shall evaluate all reasonable alternatives to the action and discuss the reasons why other alternatives, which may have been considered, were eliminated from detailed study." <u>Id</u>. § 771.123(c).

76.    A principal aim of NEPA is active public involvement and access to information.  As such, the DEIS must be circulated for comment and subjected to public hearings.  <u>Id.</u> §§ 771.123(g), (h).

77.    The DEIS must be "made available to the public" and transmitted to: "(1) [p]ublic officials, interest groups, and members of the public known to have an interest in the proposed action or the draft EIS; (2) Federal, State, and local government agencies expected to have jurisdiction or responsibility over, or interest or expertise in, the action . . . and (3) States and Federal land management entities which may be significantly affected by the proposed action or any of the alternatives."  23 C.F.R. at § 771.123(g).

78.    The regulations applicable to the FTA mandate that interested parties, such as Plaintiffs, have "[e]arly and continuing opportunities" for review, requiring:

> early and continuing opportunities during project development for the public to be involved in the identification of social, economic, and environmental impacts, as well as impacts associated with relocation of individuals, groups, or institutions.

<u>Id</u>. § 771.123(h) (cross-referencing § 771.111(h)).

79.    Accordingly, the FTA is specifically required to provide "[r]easonable notice to the public of either a public hearing or the opportunity for a public hearing."  <u>Id</u>.

80.    Following the DEIS process, an FEIS must be prepared, which must "identify the preferred alternative and evaluate all reasonable alternatives considered.  It must also discuss substantive comments received on the draft EIS and responses thereto, summarize

public involvement, and describe the mitigation measures that are to be incorporated into the proposed action." Id. § 771.125(a)(1).

81.    A Record of Decision ("ROD") must then be prepared in accordance with 40 C.F.R. Section 1505.2.  The ROD must "[s]tate what the decision was," "[i]dentify all alternatives considered," and "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted."  40 C.F.R. § 1505.2; see also 23 C.F.R. § 771.127.

82.    "The ROD will present the basis for the decision as specified in 40 C.F.R. 1505.2."  40 C.F.R. § 771.127(a).

83.    Of significance in this action, agencies are required to prepare supplements to an FEIS where, as here: "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c).

84.    Similarly, FTA's regulations implementing NEPA require that an EIS be supplemented when: "(1) [c]hanges to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or (2) [n]ew information or circumstances relevant to environmental concerns and bearings on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS."  23 C.F.R. § 771.130(a).

85.    "Where the [FTA] is uncertain of the significance of the new impacts, the applicant will develop appropriate environmental studies or, if the [FTA] deems appropriate, an [Environmental Assessment] to assess the impacts of the changes, new information, or new

circumstances.  If, based upon the studies, the [FTA] determines that a supplemental EIS is not necessary, the [FTA] shall so indicate in the project file."  23 C.F.R. § 771.130(c).

86.     "A supplement is to be developed using the same process and format (i.e., draft EIS, final EIS, and ROD) as an original EIS, except that scoping is not required."  23 C.F.R. § 771.130(d); see also 40 C.F.R. § 1502.9(c)(4).

87.     "In some cases, a supplemental EIS may be required to address issues of limited scope, such as the extent of proposed mitigation or the evaluation of location or design variations for a limited portion of the overall project."  23 C.F.R. § 771.130(f) (emphasis added).

88.     NEPA's implementing regulations thus require that agencies take a "hard look" at the environmental consequences of project changes or new information, such as the Design Change to the Second Avenue Subway Project, which arise following the publication of an FEIS to determine whether a SEIS is necessary.

89.     All assumptions made by the agency in determining whether to prepare an SEIS must be spelled out, inconsistencies explained, methodologies disclosed, contradictory evidence rebutted, record references solidly grounded, guesswork eliminated, and conclusions supported in a manner capable of judicial understanding.

90.     In applying the "hard look" test, Courts determine, among other things, whether the agency obtained opinions from its own experts, obtained opinions from experts outside the agency, gave careful scientific scrutiny, responded to all legitimate concerns raised, as well as provided a reasoned explanation for said determination.

91.     Even where an agency takes the requisite "hard look," the Court still must review the agency's decision to determine whether it has violated the APA's arbitrary and capricious standard in deciding not to issue an SEIS.

The State Environmental Quality Review Act

92.    New York State's SEQRA is modeled on NEPA.

93.    As with NEPA, SEQRA requires all state and local governmental agencies to prepare an EIS for any action they propose or approve, which may have a potential significant effect on the environment.  N.Y. Envtl. Conserv. Law § 8-0109(2).

94.    No agency subject to SEQRA can make a final determination to undertake, fund, approve or disapprove an action that has been subject to an EIS until it issues formal Findings, certifying, inter alia, that the action avoids or minimizes adverse environmental impacts to the maximum extent practicable through the incorporation of identified mitigation measures.  6 N.Y.C.R.R. § 617.11(d).

95.    An agency reviewing an action that triggers both a NEPA and SEQRA review, such as a project like the Second Avenue Subway, which requires approvals from both federal and New York State agencies, must prepare a separate EIS under SEQRA where the EIS prepared pursuant to NEPA would not be sufficient to make the formal Findings required pursuant to 6 N.Y.C.R.R. Section 617.11(d).  6 N.Y.C.R.R. § 617.15(a).

96.    Similarly, a finding of no significant impact under NEPA specifically "will not automatically constitute compliance with [SEQRA];" the subject agency "remain[s] responsible for compliance with [SEQRA]."  6 N.Y.C.R.R. § 617.15(b).

97.    In addition, "a final decision by a federal agency [under NEPA] will not be controlling on any state or local agency" reviewing the action.  The federal decision "may be considered" by the state or local agency remaining responsible for compliance with SEQRA.  6 N.Y.C.R.R. § 617.15(c).

98.    SEQRA recognizes situations may occur where "changes in the proposed project" present "significant adverse environmental impacts not addressed or inadequately addressed" in the initial FEIS.  6 N.Y.C.R.R. § 617.9(a)(7)(i).  In the event that such circumstances present itself, the lead agency may supplement its initial review to account for the new aspects of the project not adequately addressed in the initial EIS.  6 N.Y.C.R.R. § 617.9(a)(7)(i).

99.    Where supplementation is required, "it will be subject to the full procedures" of SEQRA review.  6 N.Y.C.R.R. § 617.9(a)(7)(iii).

100.    The FTA and MTA complied with none of the foregoing substantive or procedural obligations in connection with its decision to relocate the 72nd Street northeast station entrances and exits to the mid-block location.

The Eminent Domain Procedure Law

101.    New York State's EDPL applies to any and all acquisitions by eminent domain of real property within New York State by organs of state and local government, including the MTA.  N.Y. E.D.P.L. § 104.

102.    Prior to any acquisition, the condemning agency must conduct a public hearing to "inform the public and to review the public use to be served by a proposed public project and the impact on the environment and residents of the locality where such project will be constructed."  Id. § 201.

103.    At such a hearing, the condemning agency must "outline the purpose, proposed locations or alternate locations" of the project and provide such pertinent materials as "maps and property descriptions of the property to be acquired."  Id. § 203.  After this

presentation, the public "shall be given a reasonable opportunity to present an oral or written statement" concerning the project. Id.

104.     Within ninety (90) days after the conclusion of the public hearing, the condemning agency must publish its determinations and findings relating to the proposed acquisition. Id. § 204(A).

105.     The determination and findings must include a statement of: (1) the "public use, benefit or purpose to be served" by the project, (2) the "approximate location" for the project and the "reasons for selection of that location," (3) the "general effect of the proposed project on the environment and residents of the locality." Id. § 204(B).

106.     Following the determination, aggrieved persons subject to the findings may seek judicial review of the agency's proposed acts within thirty (30) days. Id. § 207.

107.     The scope of such review includes: (i) whether the proceeding conformed with the federal and state constitutions; (ii) whether the agency has statutory authority to condemn the proposed property; (iii) whether the determination and findings conformed to SEQRA's environmental review mandates; and (iv) whether the acquisition will serve a public use, benefit or purpose. Id.

108.     The MTA violated various of these provisions in seeking to condemn property relating to the Station Relocation without undertaking any of the requisite environmental and public purpose analyses under the EDPL.

<u>FACTUAL BACKGROUND</u>

<u>Second Avenue Subway Project</u>

109.     The FTA and MTA, in cooperation with MTA NYCT, have proposed a major capital project known as the Second Avenue Subway Project.

22

110.    The Project is meant to provide a "full-length Second Avenue Subway from Harlem to Lower Manhattan."  (See FEIS for the Second Avenue Subway Project, dated April 2004 (the "FEIS"),[1] at 1-1, a CD-ROM version of which is attached hereto as Exhibit "C".).[2]

111.    The Project would be a "new, two-track, approximately 8.5-mile rail line extending the length of Manhattan's East Side from 125th Street in East Harlem to Hanover Square in the Financial District."  (Id.).

112.    In addition to the full-length Second Avenue route, the Project includes a second route operating "along Second Avenue from 125th Street to 63rd Street, and then travel[ing] west along the existing 63rd Street Line, joining the existing Broadway Line, serving express stations along Seventh Avenue and Broadway before crossing the Manhattan Bridge to Brooklyn."  (Record of Decision for MTA/NYCT Second Avenue Subway Project, New York, New York, dated July 8, 2004 (the "ROD"), a copy of which is annexed hereto as Exhibit "H").[3]

113.    The overall Project would be constructed in four phases.  (See FEIS at S-15 to S-17).

114.    Of relevance here, the first phase "would include construction of three entirely new subway stations – 96th Street, 86th Street, and 72nd Street" ("Phase One").  (EIS at S-16) (emphasis added).

---

[1]    The defined term "FEIS" hereinafter is used to refer to the FEIS for the Second Avenue Subway Project.

[2]    Chapters 2 (Project Alternatives), 5D (Transportation Vehicular Traffic), 5F (Transportation Pedestrians), and 8 (Displacement and Relocation) of the FEIS, which are of particular relevance to this lawsuit, are annexed hereto in their entirety as Exhibits "D", "E", "F", and "G", respectively.

[3]    The defined term "ROD" hereinafter is used to refer to the ROD for the Second Avenue Subway Project.

115.    Phase One would be constructed pursuant to six (6) contracts.    (See MTA's Second Avenue Subway Project, Community Board 8, Constructibility Approach, dated July 11, 2006, copies of the relevant pages of which are annexed hereto as Exhibit "I").

116.    There are two contracts relevant here.    Contract One involves the construction of access shafts at 72nd Street and 2nd Avenue, which will be used to excavate the station cavern and muck removal.    Contract Four will involve the construction of the "72nd Street Station & Finishes."    (Id.).

117.    Upon information and belief, construction under Contract One, Phase One started in or about April 2007, and is currently ongoing.

The FTA's and MTA's NEPA/SEQRA Review Of The Project

118.    Important projects for the City, such as the Second Avenue Subway Project, must undergo extensive planning and review.

119.    The analysis of the Second Avenue Subway Project's alternatives and related environmental impacts under NEPA and SEQRA began in 1995, with the preparation of a combined Major Investment Study ("MIS") and DEIS.    (FEIS at 4-1).

120.    By Defendants' own account, that analysis lasted nine (9) years, and included an "extensive public outreach program," and "dozens of meetings with Community Boards, the public . . . and interested governmental agencies."    (Id. at 4-1).

121.    The Project's "public outreach program [was] initiated during the MIS/DEIS phase and continu[ed] through the SDEIS and FEIS phases."    (Id. at 4-2).

122.    The MIS and DEIS together comprised what is known as the Manhattan East Side Alternatives ("MESA") Study.    (Id. at 2-1).

123.    The MESA MIS/DEIS was published in August 1999.    (Id. at 4-2).

124.    The MESA MIS/DEIS "analyzed a wide range of possible alternatives to ease transit problems on Manhattan's East Side."  (Id. at 2-1).

125.    The MESA MIS/DEIS studied in detail four particular alternatives, none of which included a full-length Second Avenue Subway from East Harlem to Lower Manhattan.  (FEIS at 4-2).

126.    During the public outreach effort, "the public voiced its strong support for a full-length Second Avenue Subway."  (Id. at 2-1).

127.    Mindful of their responsibility to supplement a prior environmental review before finalizing substantial changes to a proposal – a practice abandoned in the instant Design Change – Defendants commenced the preparation of a supplemental draft environmental impact statement pursuant to NEPA and SEQRA requirements.  The potential environmental impacts of the full-length Second Avenue subway had not been studied or analyzed in detail in the MIS/DEIS.

128.    On March 22, 2001, the FTA and MTA/NYCT issued a Notice of Intent to prepare a Supplemental Draft Environmental Impact Statement ("SDEIS") to "evaluate a 'full-length' Second Avenue Subway alignment in Manhattan, extending from the vicinity of 125th Street in Harlem south along Second Avenue to the Financial District in Lower Manhattan." (Notice of Intent, dated March 22, 2001, a copy of which is annexed hereto as Exhibit "J").

129.    The SDEIS was intended to "present new information or circumstances relevant to the full-length Second Avenue Subway alignment and evaluate environmental impacts that were not evaluated in the MESA DEIS."  (Id.).

130.    The SDEIS was published in April 2003.  Public hearings were held in May 2003.  The public comment period remained open until June 10, 2003.  (FEIS at 4-2).

131.    In April 2004, the FTA and MTA/NYCT published the FEIS, which "respond[ed] to comments received on the MIS/DEIS published in 1999, and to comments received on the SDEIS during the public comment period." (Id. at 4-2).

The FEIS Identified 305 East 72nd Street As The
Northeast Station Entrance And Exit For 72nd Street

132.    The FEIS identified "Second Av/northeast and northwest corners of 72nd St; and northeast corner of 69th St" as the "Preliminary Entrance Location" for the Project's new 72nd Street station.  (Id. at 2-16, Table 2-1, a copy of which is annexed hereto as Exhibit "K") (emphasis added).

133.    The northeast corner of 2nd Avenue and 72nd Street is the station entrance location at issue in this lawsuit.

134.    Under the plan approved in the FEIS, the 72nd Street Station consisted of three entrances and exits: one at 69th Street, and one each on the northeast and northwest corners of 72nd Street.

135.    Under the Design Change, the 72nd Street Station would consist of four entrances and exits: one at 69th Street, one on the northwest corner of 72nd Street, and two mid-block entrances on the north sidewalk of 72nd Street in front of Plaintiffs' buildings, which are the subject of this lawsuit.

136.    The building located at the northeast corner of 2nd Avenue and 72nd Street is known as 305 E. 72nd Street.  It contains a typical CVS neighborhood pharmacy occupying a portion of the ground floor, and residences above the CVS.  Upon information and belief, CVS also occupies a portion of the basement.

137.    The station entrance, including the escalators and stairs, was proposed in the FEIS to be located within the CVS store.

138.    In describing the selection process for the locations of station entrances, the FEIS stated that "[s]tation entrances would be provided at locations" where, among other things, "the largest number of passengers are expected, based on ridership modeling information." (Id. at 8-9).

139.    The FEIS went on to state that the "72nd Street Station requires multiple entrances to serve the projected high passenger demand.  Two entrances are currently planned at 72nd Street." (Id. at 8-26).

140.    The FEIS further stated that "[b]ased on surveys and identified constraints, a preliminary list of possible entrance locations was prepared, with possible locations ranked in descending order of priority as follows:

- Existing [Special Transit Land Use District ("STLUD")] easements (if available);

- Pending and future STLUD easements;

- Vacant lots and buildings;

- Plazas and arcades;

- Possibilities for joint developments (i.e., new construction accommodating an entrance within a larger building developed for some non-transit use; and

- Open spaces such as parks, where no other feasible and prudent alternative is available, and using all practicable measures to minimize harm to the open spaces."

(Id. at 8-10).

141.    The FEIS continued, "[w]here no such sites were available, the use of portions of existing structures with street-level retail facilities was next considered." (FEIS at 8-10) (emphasis added).

27

142.    Consistent with these criteria – which on their face make no allowance for mid-block, sidewalk entrances – the building located at 305 East 72nd Street was identified as the preferred station entrance for the 72nd Street northeast location.

143.    Of significance here, although the FEIS provided that the preliminary entrance locations "are still subject to change in both number and location" due to "ongoing engineering studies," (e.g., FEIS at Table 2-1, n.2; Exhibit "K"), the FEIS analyzed only the 305 East 72nd Street location as the preferred northeast station entrance for 72nd Street.

144.    In Table 8-2, entitled "Preliminary List of Private Properties to be Acquired for Permanent Project Elements," for example, 305 East 72nd Street is listed for a proposed use as a "Station entrance" at the "Approximate location [of] NE corner 72nd St." (FEIS at Table 8-2, a copy of which is annexed hereto as Exhibit "L").

145.    Various figures and appendices in the FEIS also established that the MTA and the FTA only considered and studied the northeast corner of 2nd Avenue and 72nd Street, within 305 East 72nd Street, as the proposed location for the northeast station entrance and exit. (See FEIS at Figure 8-7, "72nd Street Station"; Figure F-6, "72nd Street Station Study Area for Potential Easements or Acquisitions"; and Appendix E.2, "Visual Analysis: Key to Photographs, 72nd Street Station Study Area," copies of which are annexed hereto as Exhibits "M", "N", and "O", respectively).

146.    The FEIS, in fact, cautioned against locating station entrances specifically on sidewalks, as now proposed under the Design Change.

147.    The FEIS stated that in order to "conform with ADA regulations, building codes and NFPA safety guidance, all stations would be accessible by escalators, elevators and stairs. Escalators and elevators require more space than stairs, and also require that station

entrances be covered for weather protection.  For these reasons, the new subway system's entrances would [be] larger than the entrance stairs to NYCT's existing, older subway lines, and would not fit within the city sidewalks without causing substantial obstruction."  (FEIS at 2-19) (emphasis added).

148.    Thus, "[s]idewalk entrances [were] not proposed unless they [could] be accommodated in a plaza or bump out setting, or already exist[ed] as part of an existing subway station into which the new Second Avenue Subway would connect."  (Id.) (emphasis added).

149.    As discussed below, the MTA ignored the traffic and other impacts associated with the contemplated "bump-out" under the Station Relocation.

150.    Mid-block entrances, such as the two now contained in the Station Relocation, clearly were not analyzed or proposed in the MTA's and FTA's 2004 FEIS, or any other related documentation.  This purposeful omission is tantamount to a determination that mid-block entrances were not options then – and should not be now – for the 72nd Street station.

151.    The FEIS considered the impacts only of proposed station entrances located at various mostly commercial intersections within 2nd Avenue, which were identified in the FEIS as the "study areas."  The FEIS did not study any locations, such as the Design Change, which fell outside of the FEIS "study areas."

The FTA Issues The ROD For The Project, Ending Its NEPA Environmental Review

152.    In July 2004, the FTA, as Lead Agency under the Second Avenue Subway Project's environmental review, issued the Record of Decision for the Project.

153.    The ROD states the formal decision of the Lead Agency, as well as identifies all alternatives considered by the Agency in reaching its decision.  40 C.F.R. § 1505.2.

154.    The ROD stated that "the requirements of NEPA have been satisfied for the Second Avenue Subway Project, proposed by the MTA and NYCT."  (ROD at 1).

155.    The ROD provided that the "environmental record for the Second Avenue Subway project includes the previously referenced MESA MIS/DEIS issued in 1999, the SDEIS issued in April 2003, and the FEIS issued in April 2004."  (Id. at 10).

156.    "These documents represent[ed] FTA's detailed analyses and findings required by NEPA." (Id.).

157.    Of relevance here, the Record, as defined in the ROD, did not contain any reference whatsoever to relocating the entrance slated for 305 East 72nd Street, or any other substantial design changes as potential alternatives.

158.    The only substantive references in the ROD to the 72nd Street station were contained in the Summary of Written Comments and Responses, Attachment B.  Those comments focused on alternative entrance locations to 305 East 72nd Street, and suggested other entrance locations at 74th Street and the southwest corner of 72nd Street.

159.    There is nothing in the ROD pertaining to or analyzing the potential environmental impacts of mid-block station entrances on 72nd Street.

160.    Upon information and belief, nor did the MTA issue its own independent findings under SEQRA for the Project as required under applicable law.

The Notice of Public Hearing Under The EDPL
Makes No Mention Of The Design Change

161.    More than three (3) years after the issuance of the ROD and the end of the environmental review for the Project, on or about August 30, 2007, the MTA mailed directly to Plaintiff 325 and Plaintiff 315 (and others) a notice of a public hearing to be held on September 30, 2007, pursuant to Article 2 of the EDPL.  (See "Notice of Public Hearing under Article 2 of

the New York Eminent Domain Procedure Law," dated August 30, 2007, (the "EDPL Hearing Notice"); a copy of the Notice sent to Plaintiff 325 and Plaintiff 315 is annexed hereto as Exhibit "P" and Exhibit "Q"), respectively).

162.    Plaintiffs had not participated in the prior NEPA or SEQRA review process.  They had no reason to believe that any aspect of the Second Avenue Subway Project would directly impact them.  There was no station entrance location or any other aspect of the Project planned for their immediate area.

163.    Plaintiffs found these notices confusing.

164.    The Notice for both Plaintiffs attached a Site Map pertaining to their respective properties.

165.    In the Chart attached to the EDPL Hearing Notice entitled "Location And Type Of Property Interests That May Be Acquired," the MTA identified by block and lot, and by street address, dozens of locations on or near 2nd Avenue between 63rd Street and 86th Street at which the MTA alleged that it might seek to acquire property interests ranging from temporary easements through full fee acquisition of any property interests.  (See id.).

166.    The EDPL Hearing Notice further stated that "[t]his is to advise you that [the MTA] will hold a public hearing to discuss the proposed acquisition of property interests and the termination of rights for certain sidewalk encroachments that will be required to construct and operate Phase 1: Contract 3, Contract 4, and Contract 5 of a project known as the Second Avenue Subway Project."  (Id.).

167.    According to the EDPL Hearing Notice, "Contract 4 consists of the 72nd Street Station, including construction along 2nd Ave. between E. 69 St. and E. 72 St."  (Id.).

168.    Given the location identified in the FEIS for the 72nd Street northeast station entrance, there was no reason to believe that Contract 4 pertained to any construction in close proximity to Plaintiffs' buildings.

169.    While the EDPL Hearing Notices sent to Plaintiffs identified their respective addresses and Block/Lot numbers as the "Location of Property To Be Acquired," the Block/Lots corresponding to Plaintiffs are <u>not</u> even listed under Contract 4 as targeted for acquisition.

170.    The <u>only</u> reference to Plaintiffs' buildings was that the "MTA also seeks the termination of all vaults and of all rights to cellar doors, enclosed sidewalk cafes, canopies, residential awnings longer than 5', and commercial awnings longer than 8' along . . . <u>both sides of E. 72<u>nd</u> St. within 500' east of 2<u>nd</u> Ave.</u>" (<u>Id.</u>) (emphasis added).

171.    Although both Plaintiff 315 and Plaintiff 325 have vaults and canopies within this 500' description, it was not clear why their vaults and canopies had anything to do with the proposed condemnation in light of how the Project was designed and approved under the FEIS and the ROD.

172.    The Site Maps attached to the EDPL Hearing Notices sent to Plaintiffs indicated that the MTA intends to "condemn or terminate" certain "sidewalk encroachments" related to Plaintiffs.  (<u>Id.</u>).

173.    The Site Maps provided, in relevant part, that "condemnation or termination of revocable consent agreements/permits applicable to the following sidewalk encroachments may be required for the construction of the Second Avenue Subway – sidewalk vault area and canopy."  (Exhibits "P" and "Q").

174.    Again, at the time, it was not clear to Plaintiffs why the MTA might terminate such sidewalk encroachments.  There was no mention in the EDPL Hearing Notice of the Design Change, or any other reconsideration of 305 East 72nd Street as the approved location for the 72nd Street northeast entrance.

MTA's Presentation At The EDPL Public Hearing
Also Makes No Mention Of The Station Relocation

175.    The MTA held a Public Hearing pursuant to Article 2 of the EDPL on September 20, 2007.  The MTA confirmed, once again, that the northeast station entrance would be located at 305 East 72nd Street as discussed and analyzed in the FEIS and ROD.  Nothing was mentioned at the Public Hearing about the possible relocation of this entrance to two (2) mid-block, sidewalk entrances in front of Plaintiffs' buildings.

176.    In fact, during his opening remarks, MTA's Deputy General Counsel stated, among other things, that "[a]nother Street Station entrance <u>will be located on the northeast corner of 72nd Street and Second Avenue</u>.  It will require the commercial relocation of a portion of a drug store and a portion of the basement area of a residential condominium." (<u>See</u> Transcript of Public Hearing, dated September 20, 2007 (the "Transcript"), at 24, a copy of which is annexed hereto as Exhibit "R") (emphasis added).

177.    The drug store and residential condominium referred to are both located within the original 305 East 72nd Street station location.

178.    Representatives from Plaintiff 325 went to the Public Hearing.

179.    Upon their arrival they inquired into the significance of the Hearing in relation to their building.

180. In response, Mr. James W. Dubbs, Government and Community Relations for MTA/NYCT, advised them that the Public Hearing "did not concern their building." Mr. Dubbs advised them that this was simply "something to be aware of."

181. Based upon this advice, they immediately left.

182. According to the Transcript, the Deputy General Counsel also went "off script for a moment to just explain that the full extent to which MTA will impacts vaults is not fully known at this time. That will be dependent on further analysis and that is done through further design, further engineering and further consideration after the contract is awarded." (Id. at 12).

183. Specifically regarding Contract 4 of Phase One, the Deputy General Counsel further stated that "Contract 4 consists of constructing the 72nd Street Station, station entrances, and ancillary facilities and completing the tunnels that will connect the 72nd Street Station to the 63rd Street Station. The southern limit of the construction will begin approximately 75 feet north of the centerline of 63rd Street, and the northern limit is approximately 50 feet north of the centerline of 72nd Street." (Id. at 13).

184. At no time during the explanation of Contract 4 did anyone from the MTA mention anything whatsoever having to do with construction of station entrances on the north east sidewalk of 72nd Street and 2nd Avenue as now contemplated under the Design Change.

185. MTA's Deputy Counsel stated that "[i]t should be noted that after the FEIS was completed in 2004, MTA has monitored and evaluated potential impacts from the project as the design for the project has progressed and, when appropriate, has shared these analyses with the FTA for review and concurrence. None of the project's design refinements

have to date been determined to create potential for any new significant environmental impacts beyond those already addressed in the FEIS." (Id. at 26).

186.    Once again, as of this September 20, 2007 Public Hearing, the Design Change publicly did not exist.

Public First Learns About The Proposed Design Change

187.    The public first learned about the Design Change on September 25, 2007, five (5) days after the EDPL Public Hearing.  (See MTA's Presentation to Community Board 8; Exhibit "A").

188.    The MTA, without any advance notice, further analysis or public review, announced the Design Change at a Community Board 8 Second Avenue Subway Task Force meeting.

189.    At the meeting, the MTA explained that the 305 East 72nd Street northeast station entrance would be replaced with two (2) mid-block entrances on the north side of 72nd Street in immediate proximity to the entrances of Plaintiffs' residential buildings.

190.    One entrance would face west, and it would be located east of the northeast corner of 72nd Street and 2nd Avenue.  The other entrance would face east, and it would be located just west of the entrance of Plaintiff 315's residential building.

191.    These entrances would be serviced by escalators and stairs, thereby requiring wider entrances on the street.  To compensate for the larger entrance structures, the sidewalk would be "bumped-out" by six (6) feet into 72nd Street.  The landscape and character of the street and sidewalk would be dramatically and permanently changed.

192.    The Design Change also contemplates lengthening the duration of cut-and-cover construction on 72nd Street.

35

193.    According to the FEIS, the only document publicly available evaluating the length of construction, "cut and cover" activities could last anywhere from "6 months to approximately 4 years." (FEIS at 3-62).

194.    Upon information and belief, Defendants had released no public announcements or information of any kind publicly concerning the Design Change prior to the MTA's Presentation to Community Board 8 on September 25, 2007.

195.    This Court need spend only a few minutes reviewing the Presentation to realize that other than a passing reference to a Site Survey, which was never made available for public review, the MTA announced the Station Relocation without any meaningful and thorough analyses of the relevant environmental impacts. (See Exhibit "A").

Defendants Failed To Study Any Of The
Design Change's Significant Potential Pedestrian Flow Impacts

196.    The FEIS notes, for example, that the 72nd Street entrances are estimated to handle among the "highest station entrance [pedestrian] volume" on the subway line. (FEIS at 5F-5).

197.    Upon information and belief, each day 30,000 pedestrians would utilize the mid-block sidewalk entrances located in front of Plaintiffs' buildings under the Station Relocation, presenting a plethora of pedestrian flow impacts.

198.    Defendants proposed the Design Change without conducting, among other studies, any of the standard pedestrian flow protocols for the new sidewalk entrance locations, despite performing those precise examinations for the original locations identified in the 2004 FEIS. (See FEIS, Chapter 5-F, Appendix D.3).

199.    Such omissions were, in fact, in direct contradiction to the FEIS' statement that "[a]dditional significant impacts could also be created at other locations if station entrances were moved or added."  (FEIS at 5F-4).

200.    In addition, the FEIS was clear as to the limitation of its study area, stating that the "72nd Street Station Study Area" was limited to the crosswalks and corners of 2nd Avenue, and did not extend east or west down the cross-streets.  (See FEIS Figure 8-7).

201.    Defendants were required to supplement the pedestrian flow analyses contained in the FEIS prior to announcing the Design Change.  The specific characteristics of the residential mid-block locations are significantly distinct from the original commercial corner location.

202.    The MTA and the FTA have failed to undertake and/or make available to the public any empirical data or analysis establishing that they undertook such analysis.  There has not been one iota of information released to the public to date demonstrating in empirical fashion that the new mid-block, sidewalk location could efficiently process and disperse the expected high pedestrian volume entering and exiting the station entrances.

203.    The New York City Environmental Quality Review Technical Manual ("CEQR Manual") sets forth in detail the appropriate methodologies for conducting pedestrian flow analyses in New York City.  None of the procedures or studies set forth in the Manual were followed here relating to the Design Change.

204.    The CEQR Manual was prepared by AKRF, the environmental consultants for the MTA, who also prepared the 2004 FEIS for the Project.

205.    According to the CEQR Manual, Defendants must determine whether the capacity of the new sidewalk design will be able to "process or store" the expected pedestrian

volume generated by the project.  (CEQR Manual at 3P-1; a copy of Chapter P of the CEQR Manual is annexed hereto as Exhibit "S").

206.    Indeed, the threshold for a pedestrian analysis is 200 peak hour rail riders. Where an agency finds higher levels of flow will clearly not produce significant impacts, "this finding should be documented."  (Id.).

207.    The CEQR Manual sets forth standards for mid-block pedestrian flow studies, noting that one of the most important parameters of this analysis is the total sidewalk width and obstacles in the sidewalk presented by the project.  (Id. at 3P-9).

208.    The FEIS does not contain any such studies relating to the new mid-block locations of the station entrances.

209.    Of relevance here, Defendants failed to study the effect of "platoons" in pedestrian volume.  (See id.).  This refers to instances during the day when subways "release a large group of pedestrians in a short period of time" out into the street.  (Id.).  This is exactly what Plaintiffs expect to occur at the front door of their buildings on a daily, persistent basis with the Design Change.

210.    Again, where this study leads an agency to determine that a proposed action will not present significant impacts, a reasoned elaboration must be documented.  This is not only required under CEQR standards, but is mandated by both NEPA and SEQRA.

211.    Defendants must be compelled to supplement their pedestrian studies to examine whether the mid-block locations can appropriately manage the expected pedestrian flow before they can even consider relocating the entrances to the proposed location.

Defendants Ignored The Design Change's
Significant Potential Vehicular Traffic Impacts

212.    The FEIS also failed to identify and address the potential adverse impacts upon vehicular traffic caused by the proposed Station Relocation.

213.    Chapter O of the CEQR Manual describes the required traffic impact studies when a change in the street design is expected.  (A copy of the relevant pages of Chapter O of the CEQR Manual is annexed hereto as Exhibit "T").

214.    The CEQR Manual states the purpose of a traffic flow analysis is to "evaluate the sufficiency of street and highway elements to adequately process the proposed action's expected traffic flow and operating condition changes."  (CEQR Manual 30-1).  The scope of this evaluation should include roadways where accident potential or residential traffic character is expected to be significantly impacted.  (Id.).

215.    In accordance with the CEQR Manual, as well as Defendants' own standards set forth in the FEIS, the potential change in flow conditions caused by the narrowing of a major east-west route should have been studied before Defendants finalized the Design Change.

216.    The FEIS includes 72nd Street in its list of "Major Locations/Routes with Congestion." (FEIS, Figure 5D-1).  Defendants have included in the Design Change a significant "bump-out" of the north-eastern sidewalk into 72nd Street to accommodate the large mid-block entrances.  The extension would likely lead to vehicular traffic impacts on this busy route, yet the Defendants have failed to meaningfully analyze any of its potential effects.

217.    The FEIS limited its traffic analysis to impacts during construction, rather than looking at the permanent effects of the Project's proposed changes to street alignment.  Significantly, the intersection of 72nd Street and 2nd Avenue was not one of the selected

intersections where data was collected to assess potential adverse impacts on traffic flow. Instead, only seven representative construction zones were selected for a "detailed traffic impact analysis." (FEIS at 5D-10).

218.    In terms of the impacts of entrance design on traffic, the FEIS noted only that several locations were "being evaluated for stairwell and ADA access, and may entail some redesign or reconfiguration of curb lines, such as the extension of the sidewalk along the west side of Bowery/Park Row." (Id. at 5D-31). Any such changes, however, "would be implemented only with the completion of a traffic analysis indicating that either there would be no significant impacts to traffic flow or that such impacts could be mitigated." (Id.) (emphasis added).

219.    The circumstance in the Bowery/Park Row location is very similar to the Design Change, where the "bump-out" would occur.

220.    Such a traffic analysis should have been completed for the Station Relocation under Defendants' own standards as expressed in the FEIS, again, before the MTA and FTA even considered such material changes to the location of the station entrances at this location.

Defendants Failed To Examine The Design Change's
Significant Potential Impacts Upon Neighborhood Character

221.    The residential character of Plaintiffs' mid-block neighborhood would also unquestionably be significantly impacted by the Design Change.

222.    It is arrogant, as well as arbitrary and capricious, to think otherwise, especially without undertaking any of the necessary and established studies.

223.    The FEIS in 2004 recognized the "prevailing row-house character of mid-block area in the Upper East Side." (FEIS at 6-7). Defendants acknowledged the potential for

the Project to impact neighborhood community, devoting fifty six (56) pages to the Social and Economic Conditions along Second Avenue.  (FEIS at Chapter 6).

224.    Of relevance here, the FEIS concluded that the design of station entrances would be "sensitive to the surrounding architectural context; they would not disturb views in the study area nor would they change the study area's urban design."  (FEIS at 6-49).  The MTA and FTA thus concluded in the 2004 FEIS that the station entrances would not produce significant adverse impacts upon the neighborhood character.  (Id.).

225.    The CEQR Manual instructs that neighborhood character is "an amalgam of the various elements that give neighborhoods their distinct 'personality.'"  (CEQR Manual at 3H-1).  Where a project will have "moderate effects" upon several of these elements, an assessment of the impact on neighborhood character is required.  (Id.).

226.    Included in the list of elements are: (i) changes to street patterns; (ii) modifications to curb cuts; (iii) increases in pedestrian activity and circulation; (iv) changes to the natural features of the neighborhood; and (v) alterations in traffic patterns.  (Id.).

227.    All of these elements are implicated here, yet were never studied, analyzed or publicly documented in any way in connection with the MTA's Design Change.

228.    The CEQR Manual directs that "the more uniform and consistent the existing neighborhood context is, the more sensitive to change it is."  (Id. at 3H-4).  Although it is ultimately up to the lead agency to establish which significant impacts are adverse and must be mitigated, the Manual suggests "consider[ing] comments made during public review in making such a determination."  (Id.).

229.    Once again, however, Defendants' "study area" was limited to the corners of 72nd Street and 2nd Avenue.  The FEIS did not identify or analyze the potential impacts upon

the neighborhood character at the new mid-block Design Change location, a very distinct and different neighborhood character than the commercial intersection at the northeast corner of 72nd Street and Second Avenue, the original location for the station entrance. (See FEIS at Appendix E.2).

230.    By excluding the exclusively residential mid-block area from the community character study area, Defendants have failed to take the requisite hard look at the Design Change's impact upon the residential quality of Plaintiffs' distinct neighborhood. Moreover, by denying Plaintiffs an opportunity to comment upon the Design Change before its finalization, Defendants have circumvented the review procedures articulated in the CEQR Manual, and mandated by NEPA and SEQRA.

Defendants Have Not Examined The Design Change's Significant Potential
Impacts Upon Traffic, Noise And Infrastructure During Construction

231.    The Station Relocation will also produce significant potential adverse impacts to Plaintiffs' neighborhood during the up to four (4) year construction period. These impacts were never addressed or even discussed in the 2004 FEIS .

232.    Where construction in a certain location will be lengthy, "such as large-scale actions with relatively long-term construction periods," the CEQR Manual proposes that such impacts be studied and analyzed as an essential part of the environmental review process. (CEQR Manual at 3S-1; a copy of the relevant pages of Chapter S of the CEQR Manual are annexed hereto as Exhibit "U").

233.    Similarly, the impacts of persistent blasting and demolition over an extended period of time on a neighborhood's character must be addressed. (See id. at 3S-2).

234.    The City's own CEQRA guidance manual also requires the study of the impacts on pedestrian flow when construction activity is expected to have long-term effects, and

will cause the closure or narrowing of sidewalks.  (Id.).  The Manual calls for a "detailed study of construction . . . for proposed projects where key pedestrian processors (e.g. sidewalks, crosswalks, corners) or access points to transit would be relocated, closed, narrowed, or otherwise impeded due to construction activity."  (Id. at 3S-5).

235.    Similarly, the CEQR Manual identifies potential impacts upon area infrastructure as critical to any review process where prolonged construction might occur. (Id. at 3S-3).  These include the effects of in-ground construction on water main service, utilities, etc. (Id.).

236.    The FEIS estimated that during station construction, "traffic lane closures or sidewalk narrowing could last from less than 6 months to approximately 4 years." (Id. at 3-62.)  Although the actual duration of these impacts would vary, the FEIS provided that the "longer durations would generally occur where stations would be constructed."  (Id.).

237.    The construction impact analysis in the FEIS made no mention of the unique construction impacts that would result from the Station Relocation.

238.    As stated above, the Design Change includes numerous design aspects unique to the 72nd Street station, the least of which being the placement of two entrances in the sidewalk immediately in front of residential buildings.

239.    It is also unclear, for example, the duration of the construction and the potential increase in its length due to moving the stations mid-block directly in front of residential buildings.

240.    Similarly, it is unclear what construction methods would be used to excavate and construct these entrances directly on the sidewalks outside Plaintiffs' residential entrances.

241.    Defendants have further indicated that as part of their condemnation action, the vault area of Plaintiff 325's property will be partially acquired for use during and after construction.  This area houses the building's only oil storage tank. Said construction could potentially significantly impact Plaintiff 325's infrastructure service.

242.    None of these potential impacts were ever studied by Defendants, in the 2004 FEIS or otherwise.

243.    Defendant must be compelled to supplement the construction impact analysis to include the potential impacts upon the character, pedestrian flows, noise levels and infrastructure disruptions on Plaintiffs' mid-block residential buildings and neighborhood.

Defendants Also Never Studied Alternatives To The Design Change

244.    Defendants have also failed to publicly examine existing or potential alternative locations to the proposed mid-block entrances, including, but not limited to, utilizing the existing Transit Easement within the premises located at 304-308 East 72nd Street, and the possibility of returning to the original entrance at 305 East 72nd Street, which could produce far fewer adverse impacts and are consistent with the station design criteria set forth in the FEIS.

The Possible Alternative Of Utilizing The Existing NYCT Transit Easement
Within 304-308 East 72nd Street Should Have Been Analyzed In A Public Forum

245.    The premises commonly known as 304-308 East 72nd Street (i.e., Block 1446, Lots 47, 48, 49, 50, 149 and 150) (the "306 Easement Premises") is located within what is known as a Special Transit Land Use District ("STLUD").

246.    A STLUD development is subject to the provisions of Article IX, Chapter 5, of the New York City Zoning Resolution ("ZR").

247.    Pursuant to ZR Section 95-03, any new ground level development constructed after 1974 "shall provide an easement on the zoning lot for subway-related use and

public access to the subway mezzanine or station when required pursuant to the provisions of Section 95-04." ZR § 95-03.

248.    Pursuant to ZR Section 95-04, the NYCT and the New York City Planning Commission certified that a Transit Easement is required on the Zoning Lot containing the 306 Easement Premises.  ZR § 95-04.

249.    Parker East 72nd Associates, L.P., the owner of the Premises ("Owner") and the NYCT entered into a Transit Easement, captioned "Basement Volume Agreement" ("BVA"), as of June 1, 1996.  (A copy of the BVA is annexed hereto as Exhibit "V").

250.    Therein, the Owner granted to the NYCT a perpetual easement through a specified volume of space (the "Easement Space")" for the construction and maintenance of "staircases and elevators" for pedestrian ingress and egress between East 72nd Street or Second Avenue and the proposed Second Avenue subway.  (Id. at 2).

251.    Pursuant to ZR Section 95-06, as enacted in 1974 and amended in 1996, the Owner may temporarily use the Easement Space "until such time as required by the Transit Authority or by its designee for subway purposes."  ZR § 95-06.  The quoted portion of ZR Section 95-06 has remained unchanged since its enactment.

252.    In the BVA, in contravention of ZR Section 95-06 as it then and now reads, the NYCT purported to grant the Owner permission to use the Easement Space for a minimum of 18 ½ years from the date of the BVA, whether or not the Easement Space was required for public access to the subway during that time period.

253.    Under this illegal deferral of use of the Easement Space at the time the BVA was entered, the NYCT could not use the Easement Space until in or about December 2014

(the FEIS mistakenly states that the Easement Space could not be used until 2022).  (<u>See</u> FEIS at 2-20).

254.    Pursuant to the ZR, the Easement Space is <u>presently available</u> to provide public access to the subway, subject only to the requirement in Section 95-06 of the ZR that the NYCT give the Owner a minimum of six months notice in writing that public use of the Easement Space is required.

255.    Again, the FEIS identified locating station entrances within "existing STLUD easements (if available)," such as the Transit Easement existing and available here, as the MTA's top priority among other possible locations.  (FEIS at 8-10).

256.    Upon information and belief, the NYCT has chosen not to provide public access to the subway through the Easement Space because it would require additional volume at that site of the Easement Space in order to provide acceptable public access to the subway.

257.    The MTA has not provided any information regarding the criteria it used or its analysis by which it determined that a Transit Easement that was seemingly of adequate dimension and volume in 1996 is no longer adequate to meet the Project's needs.

258.    Upon information and belief, in the event that the NYCT actually would require additional volume at the site of the Easement Space, it could obtain such additional volume, which would be located well below any usable space at the 306 Easement Premises.

259.    To the extent this "depth/volume issue" purports to create obstacles to the use of the Easement Space, the NYCT must study (at a minimum), in a public forum, possible ways to resolve this alleged impediment.

260.    Because the Easement Space is available for public access to the subway at no cost to the NYCT, any expenditures by the NYCT to acquire other space for public access

to the subway from the east side of Second Avenue, let alone from the middle of the block on East 72nd Street running from Second Avenue to First Avenue, is a waste of public funds and resources.

261.    To expend additional public funds to place the subway entrance other than at the site of the Easement Space is particularly irresponsible in light of the apparent fact that the MTA has insufficient funds to carry out the current phase of Second Avenue Subway construction, and is seeking to "identify areas where costs can be cut and the [Project] scaled back."  William Neuman, *Higher Costs May Curtail M.T.A. Work*, N.Y TIMES, January 29, 2008, at B1, a copy of which is annexed hereto as Exhibit "W".

262.    Pursuant to EDPL Section 204(B) (1), "[t]he condemnor, in its determination and findings, shall specify . . . the public use, benefit or purpose to be served by the proposed public project."

263.    The MTA since 1996 has had at the 306 Easement Premises a Transit Easement designed for the specific purpose of providing public access to the Second Avenue Subway from the east side of Second Avenue.

264.    Since the MTA already has this Transit Easement, which if necessary can at little or no additional cost be expanded to accommodate public access to the Second Avenue Subway from the east side of Second Avenue, the taking of Plaintiffs' and others' property through the re-siting of the subway entrance on the north side of East 72nd Street half-way between Second Avenue and First Avenue has no public purpose.

The Alternative Of Returning The Station Entrance To 305 East 72nd Street,
The MTA's Admitted Preferred Location, Should Have Been
Thoroughly Examined And Subject To Public Review

265.    The MTA consultants and engineers have stated that there is no physical impediment to maintaining the subway entrance at the northeast corner of East 72nd Street and Second Avenue (i.e., 305 East 72nd Street) as long as certain modifications were made to the site.

266.    Upon information and belief, these modifications are technically feasible, and involve moving the mechanical and utility rooms within said premises, and making certain modifications in the escalators and stairways as originally designed to avoid unnecessary reconfiguration of the basement areas of 305 East 72nd Street.

267.    Upon information and belief, as defined by the MTA's own criteria and studies, this is a superior solution to the Station Relocation.

268.    Upon information and belief, the MTA claims that the subway entrance was moved from 305 East 72nd Street to directly in front of Plaintiffs' buildings because the "MTA would not be able to obtain a private property interest from one party through the condemnation process for the use by another private party."  (MTA Letter; Exhibit "B").

269.    This decision was made, however, without any input from those parties facing the most potential harm from the relocation.

270.    Moreover, this "legal explanation," completely undocumented and not analyzed in any public forum, is totally inapplicable to the purported engineering problem identified by the MTA's engineers at 305 East 72nd Street.  If, in fact, the subway project requires the taking of space in the commercial condominium portion of those premises and transferring it to the residential condominium unit that contains the residential cooperative apartments, or vice versa, in order to carry out the public purpose of constructing public access to the Second

Avenue Subway, it is perfectly legal and proper for the MTA to use its condemnation power to do so.

271.    Since the public purpose of assuring appropriate public access to the Second Avenue subway is best served by retaining the entrance at 305 East 72nd Street, the re-siting of the entrance does not meet the public purpose requirement of the EDPL.

272.    Defendants failed to meet their most fundamental obligations under NEPA and SEQRA to evaluate these and other potentially viable alternatives to the Station Relocation, in an open and deliberative process, prior to finalizing its decision to relocate the station's northeast entrance and exit.

Despite Not Studying The Potential Significant Environmental Impacts
Or Other Viable Alternatives, Defendants Finalized the Station Relocation

273.    It is clear from the limited information made public, to date, that the Station Relocation is a final decision, not open in the MTA's eyes to further debate and/or environmental analysis as part of a supplemental review.

274.    The most evident and recent example of this "finality" is set forth in the MTA's letter to NYC Councilmember Jessica Lappin dated January 23, 2008, stating that "[T]he entrance has to be relocated to the sidewalk of East 72nd Street."   (See MTA Letter; Exhibit "B") (emphasis added).

275.    In response to a question as to why the MTA is not conducting a supplemental EIS, the MTA goes on to state that it has "analyzed the pedestrian conditions of the sidewalk entrance and found that the change does not result in any significant pedestrian impacts," and therefore "[a] new EIS is not required."  (Id.).

276.    Indeed, the MTA readily admits on a page on its website entitled "Second Avenue Subway: Project Update" that "some important changes to the design have occurred

subsequent to FEIS's publication." (MTA, *Second Avenue Subway: Project Update* (last visited February 2, 2008) available at http://mta.info/capconstr/sas/sas_sched.htm, a copy of which is annexed hereto as Exhibit "X"). (emphasis added).

277.    That document lists in a chart the "notable changes in the [P]roject since the publication of the FEIS in 2004." (Id.). (emphasis added).

278.    Once again, although the MTA recognized that the Station Relocation represented an "important" and "notable change[]" to the Project, no open or deliberative environmental review was conducted before the MTA and FTA finalized the Design Change. (Id.).

279.    The manner and procedures described herein by which the MTA and FTA finalized the Design Change, once again, violate the most fundamental environmental review obligations mandated by NEPA and SEQRA.

MTA Approves Determination and Findings
Under Article 2 Of The EDPL

280.    Notwithstanding Defendant's failure to comply with their most basic environmental review obligations as outlined, supra, the MTA proceeded toward condemning various property interests it required for, among other things, the Station Relocation.

281.    By letter dated December 19, 2007, the MTA announced its approval of "the enclosed Determination and Findings under Article 2 of the EDPL in connection with Contracts 3, 4 and 5 of Phase I of the Second Avenue Subway Project." (See Determination and Findings Under Article 2 of the New York Eminent Domain Procedure Law, dated December 19, 2007, a copy of which is annexed hereto as Exhibit "Y").[4]

---

[4]    The handwriting on the annexed Determination and Findings is that of a resident of Plaintiff 325.

282.    The Determination and Findings purported to constitute the findings required by Section 204 of the EDPL.

283.    This announcement was made, again, without any public deliberation and consideration of the potential environmental impacts of the proposed plans requiring the MTA to condemn properties, despite this being an essential part of the EDPL process.

284.    The cover letter stated that the "property interests necessary to be acquired for Contract 4 are generally located on Second Avenue between East 63rd Street and East 73rd Street, as the work covered by Contract 4 principally consists of the construction of the new 72nd Street station, together with entrances and ancillary facilities for the station, and completing the tunnels that will connect the 72nd Street station to the 63rd Street station."  (Id.).

285.    The cover letter goes on to state that "Contracts 3, 4 and 5's location and alignment were determined after years of detailed planning, environmental review and public outreach.  MTA and the [FTA] fully evaluated alternatives during that process."  (Id.).

286.    The cover letter failed to mention, however, that the northeast station entrance studied in the FEIS for the 72nd Street station was located within the corner building at 305 East 72nd Street, not in the middle of the sidewalk as contemplated under the Design Change.

287.    Contrary to the representations in the cover letter, the current locations on the north sidewalk of 72nd Street and east of 2nd Avenue were also never part of the MTA's and the FTA's prior environmental review.

288.    The Determination and Findings enclosed with the cover letter continued to perpetuate the falsehood that the "Project's specific location and alignment within this area were determined after years of detailed planning, environmental review and public outreach."  (Id.).

289.    The Determination and Findings also "incorporated by reference" the "FEIS and Record of Decision, and all evaluations and environmental findings presented in the FEIS and Record of Decision."  (Id.).

290.    Again, the FEIS and ROD do not contain any reference to the mid-block, sidewalk station entrances on 72nd Street contemplated under the Station Relocation.

291.    There is one veiled reference to the Design Change in the middle of a paragraph on the third page of the Determination and Findings: "Another 72nd Street Station entrance will be located east of Second Avenue on the north sidewalk at 72nd Street.  No commercial or residential relocation is required."  (Id.).

292.    The Determination and Findings failed to account for the fact that this station location "east of Second Avenue on the north sidewalk at 72nd Street" was not part of the "years of detailed planning, environmental review and public outreach" culminating in the 2nd Avenue FEIS and ROD.

293.    In addition, included in the Determination and Findings is a Chart identifying the specific location of property interests that will be acquired by the MTA for Contracts 3, 4 and 5.

294.    Once again, the Block and Lot designations for Plaintiffs' properties were not listed in the Chart for Contract 4.

295.    Reflective of the Design Change, unlike the Chart for Contract 4 in the August 30, 2007 Notice of Public Hearing (Exhibits "P" and "Q"), only a Temporary Easement is now identified to be taken at "305 East 72 St." (Exhibit "Y").

296.    The Chart for Contract 4 goes onto provide that "MTA also seeks the termination of all vaults and of all rights to cellar doors, enclosed sidewalk cafes, canopies,

residential awnings longer than 5', and commercial awnings longer than 8' along . . . the north side of E. 72nd St. within 500' east of 2nd Ave." (Exhibit "Y").

297.    The MTA seeks such termination even though it admitted at the September 20, 2007 Public Hearing that "the full extent to which the MTA will impact vaults is not fully known at this time." (Transcript at 12; Exhibit "R").

298.    In addition, upon information and belief, the MTA has not studied the impacts of terminating Plaintiffs' vaults, including, the impacts stemming from the fact that approximately one-half of the oil tank for Plaintiff 325 is located within its vault, or the feasibility and safety of relocating utility connections within the vaults of both Plaintiff 315 and Plaintiff 325.

299.    Plaintiffs have not been provided with any information regarding the potential termination of their respective vaults and canopies.

300.    In fact, the MTA has provided no response to the January 9, 2008 letter sent to the MTA by Counsel for Plaintiff 315 requesting, among other things, "more detailed information about which of the above-referenced terminations are expected to occur at or adjacent to 315 East 72nd Street." (See Letter from Steven M. Polan, Esq. of Manatt, Phelps & Phillips, LLP, counsel for Plaintiff 315, to Anthony P. Semancik, Esq., MTA Deputy General Counsel, dated January 9, 2008, a copy of which is annexed hereto as Exhibit "Z").

301.    Moreover, it is unclear why the MTA no longer intends to seek the termination of all vaults and other items along both the north and south sides of East 72nd Street within 500' east of 2nd Avenue, as indicated in the August 30, 2007 Notice of Public Hearing. (See Exhibits "P" and "Q").

302.    The Determination and Findings provided that whereas the MTA continues to seek the termination of all vaults and other items on the north side of East 72nd within 500' east of 2nd Avenue, the MTA now seeks such termination on the south side of East 72nd Street within a distance of 450' east of 2nd Avenue.  There is no explanation for this 50' change in the Determination and Findings.  (See Exhibit "Y").

MTA Meets With Plaintiffs

303.    Having already announced and finalized the Station Relocation, and after concluding its EDPL Public Hearing, the MTA agreed to meet with Plaintiffs' representatives on January 24, 2008, at the offices of the MTA's engineering consultant, DMJM Harris·ARUP, located at 20 Exchange Place, New York, New York.

304.    The MTA scheduled the meeting upon Plaintiffs' repeated requests.

305.    Only the most minimal general information was provided at the meeting, including, the MTA's purported rationale for moving the 72nd Street northeast station entrance from within the corner building located at 305 East 72nd Street to the mid-block, sidewalk entrances on the north side of 72nd Street, and the purported reasons for rejecting other alternative locations.

306.    No studies, reports, analyses, data, technical drawings or any other environmental information were made available to Plaintiffs at the meeting.

307.    Later that afternoon, counsel for Plaintiff 325 submitted a request by electronic mail to the designated representative of the MTA for certain documents and drawings.  At the meeting, the MTA indicated that Plaintiffs would be provided with such information "in the next couple of days."

308. As of the filing of this Complaint, Plaintiffs have received none of the requested documents.

309. The Record of environmental review for the Station Relocation appears to consist entirely of the MTA's Presentation to Community Board 8 on September 25, 2007, and the MTA's after the fact Letter to NYC Councilmember Lappin on January 23, 2008. (See Exhibits "A" and "B," respectively).

310. This so-called Record falls remarkably short of NEPA's and SEQRA's requirement to prepare a thorough and meaningful Supplemental Environmental Impact Statement, analyzing all the relevant impacts and possible alternatives, when substantial changes are made to a project, such as the Station Relocation, presenting environmental concerns not previously studied as part of the project's prior environmental review.

## COUNT I
### (Violation of APA/NEPA)

311. Plaintiffs respectfully reallege Paragraphs 1 to 310 of this Complaint as if stated fully herein.

312. NEPA required Defendants to supplement the FEIS prior to finalizing the Design Change to determine, inter alia, the potential environmental impacts of such change, whether all alternatives had been considered and whether all practicable means to avoid or minimize environmental harm have been adopted. 40 C.F.R. § 1502.9; 23 C.F.R. § 771.130.

313. The Design Change or Station Relocation represents, by MTA's own standards, an "important" and "notable" change to the Second Avenue Subway Project, with the obvious potential for significant environmental impacts that were not studied in the 2004 FEIS.

314. While all of the relevant environmental impact study areas for the 72nd Street station in the FEIS covered the mostly commercial northeast corner of 72nd Street and 2nd

Avenue, none of those impact study areas extended farther east along 72nd Street to include the distinctly different residential area in and around Plaintiffs' buildings.

315.    Defendants' decision to finalize the Design Change without first examining whether the new location would present potentially adverse impacts not previously examined or even identified in 2004 was arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and the applicable law.

316.    In fact, the ROD adopted by the MTA and FTA as part of the this Project in 2004 mandates that "MTA and NYCT, in cooperation with FTA, shall initiate a supplemental environmental review of the Project, as outlined in 23 CFR 771.130, whenever: (1) Substantial changes to the project would result in significant environmental impacts that were not evaluated in the FEIS; (2) New information or circumstances relevant to environmental concerns and bearing on the Project or its impacts would result in significant environmental impacts not evaluated in the FEIS; or (3) where the significance of new impacts is uncertain."  (ROD at 14; Exhibit "H")

317.    The cover letter from the FTA to the MTA, dated July 8, 2004, similarly states that "[i]f changes to the [P]roject are made, FTA must be notified and appropriate supplemental environmental studies conducted before changes will be approved."  (Cover Letter from the FTA to MTA, dated July 8, 2004; Exhibit "H").

318.    Defendants have violated their own correctly articulated standards. Defendants' supplemental environmental review obligations, as described in the ROD, are expressly set forth in NEPA's implementing regulations.

319.    Pursuant to NEPA's implementing regulations, including 40 C.F.R. Section 1502.9 and 23 C.F.R. Section 771.130, Defendants were required to supplement the

FEIS for the Project if they either made substantial changes in the proposed action that are relevant to environmental concerns, or if there arose significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

320.     Defendants made a substantial change in the Project by moving the 72nd Street northeast station entrance, which is expected to service the highest level of pedestrian traffic, to the middle of a residential block.  This substantial change in the Project would result in significant environmental impacts not evaluated in the FEIS, including, but not limited to, the Design Change's potential significant site specific impacts both during and after construction on pedestrian flow, vehicular traffic, and community character.

321.     In addition, new circumstances or information supposedly discovered by Defendants after the FTA issued the ROD regarding the feasibility of locating the entrance within the corner building at 305 East 2nd Street, including, but not limited to, purported obstructions due to the presence of various utilities, also trigger the need to prepare a supplemental environmental review.

322.     Defendants also violated NEPA by failing to study adequately alternatives to the Station Location in an open and deliberative process as part of a Supplemental EIS.

323.     NEPA's implementing regulations establish that if a cost-benefit analysis supports a particular selection among alternatives, it must be incorporated by reference or appended to the relevant statement as an aid in evaluating the environmental consequences.  40 C.F.R. § 1502.23.

324.    Thus, even if Defendants are relying upon cost savings as their rationale for selecting the Station Relocation as their preferred alternative, they were required to have prepared a cost-benefit analysis.

325.    Defendants have never made public a cost-benefit analysis regarding the Station Relocation.

326.    It is well-established NEPA law that misleading and unfounded economic assumptions undermine the function of environmental review by impairing an agency's consideration of the adverse environmental effects of a proposed project.

327.    Defendants have failed to document a rational (or any) underlying evaluation of the purpose or need for a change in the location of the 72nd Street northeast station entrance, or of the Design Change and its mid-block, sidewalk entrances as the preferred alternative location, thus rendering its cursory review fatally flawed.

328.    Defendants should have prepared a supplemental EIS to study the environmental impacts of the Design Change, as well as other new circumstances and/or information relevant to environmental concerns, which are implicated by Defendants' proposed actions.

329.    This analysis or lack thereof from the standpoint of compliance with the pertinent environmental laws and regulations is patently inadequate.

## COUNT II
### (Violation of SEQRA)

330.    Plaintiffs respectfully reallege Paragraphs 1 to 329 of this Complaint as if stated fully herein.

331.    Pursuant to SEQRA, the MTA, NYCT and MTA Capital were required to prepare a separate EIS under SEQRA if the EIS prepared pursuant to NEPA was not sufficient to

make the formal Findings required pursuant to 6 N.Y.C.R.R. Section 617.11(d).  6 N.Y.C.R.R. §

617.15(a).

332.    Upon information and belief, neither the MTA, NYCT nor MTA Capital

prepared SEQRA Findings, as required by 6 N.Y.C.R.R. Section 617.11(d), for the proposed

Station Relocation and so much of the Second Avenue Subway Project as may be dependent

upon it.

333.    Even if such SEQRA Findings were prepared, the FEIS prepared under

NEPA here was insufficient to make the requisite Findings required for the proposed Station

Relocation pursuant to 6 N.Y.C.R.R. Section 617.11(d).

334.    In addition, where a determination that an action will not require an EIS is

made under NEPA it does not constitute automatic compliance with SEQRA.

335.    Any findings made by Defendants under NEPA that the proposed Station

Relocation, and so much of the Second Avenue Subway Project as may be dependent upon it,

would have no significant environmental impacts, would not satisfy SEQRA.  6 N.Y.C.R.R. §

617.15(b).

336.    Defendants the MTA, NYCT and MTA Capital remain responsible for

compliance with SEQRA for the proposed Station Relocation, and so much of the Second

Avenue Subway Project as may be dependent upon it.

337.    The potential significant impacts related to the Station Relocation, and so

much of the Second Avenue Subway Project as may be dependent upon it, surpass the

established low threshold triggering the requirement to prepare an EIS under SEQRA.

338.    Defendants the MTA, NYCT and MTA Capital violated SEQRA through

their failure to prepare a separate, supplemental EIS under SEQRA.

339.    The Station Relocation presents potentially significant and adverse environmental impacts, which were not addressed in Defendants' original FEIS. The FEIS's "study areas" did not include the newly designed mid-block station entrance locations. Prior to finalizing the Station Relocation, the MTA should have performed a supplemental EIS pursuant to 6 N.Y.C.R.R. Section 617.9(a)(7).

340.    Any analysis regarding the potential impacts of the Station Relocation following the FEIS was conducted without public participation.

341.    The potential significant impacts upon pedestrian flows, vehicular traffic and community character, among other impacts, surpass the established low threshold triggering the requirement to prepare a supplemental EIS under SEQRA.

342.    The MTA, NYCT and MTA Capital further violated SEQRA through, upon information and belief, their failure to issue formal Findings required pursuant to 6 N.Y.C.R.R. Section 617.11(d) setting forth a reasoned elaboration supporting the decision to finalize the Station Relocation.

343.    Accordingly, the MTA, NYCT and MTA Capital have failed to conduct the type of analysis and deliberation required by SEQRA, and should be compelled to evaluate the Design Change using, at a minimum, the same methodology employed in the FEIS in an open and public manner.

<u>COUNT III</u>
(Violation of EDPL § 204(B)(1) / Public Purpose / Excess Condemnation)

344.    Plaintiffs respectfully reallege Paragraphs 1 to 343 of this Complaint as if stated fully herein.

345.     Pursuant to EDPL Section 204(B)(1), "The condemnor, in its determination and findings, shall specify . . . the public use, benefit or purpose to be served by the proposed public project."

346.     Defendants, since 1996, have had at the Easement Premises a Transit Easement designed for the specific purpose of providing public access to the Second Avenue Subway from the east side of Second Avenue.

347.     Since Defendants already had this Transit Easement, which if necessary could, at little or no additional cost, be expanded to accommodate public access to the Second Avenue Subway from the east side of Second Avenue, the taking of Plaintiffs' property through the re-siting of the subway entrance on the north side of East 72nd Street half way between Second Avenue and First Avenue had no public purpose.

348.     Further, on information and belief, based on statements by MTA personnel and the MTA's January 23, 2008 Letter to Councilmember Lappin, the MTA claims that the subway entrance was moved from 305 East 72nd Street to directly in front of Plaintiffs buildings because the "MTA would not be able to obtain a private property interest from one party through the condemnation process for the use by another private party."  (MTA Letter; Exhibit "B").

349.     This "legal explanation" is totally inapplicable to the purported engineering problem at 305 East 72nd Street identified by the Defendants' engineers.  If, in fact, the subway project requires the taking of space in the commercial condominium portion of those premises and transferring it to the residential condominium unit that contains the residential cooperative apartments, or vice versa, in order to carry out the public purpose of constructing public access to the Second Avenue Subway, it is perfectly legal and proper for Defendants to use their condemnation power to do so.

350.    Since the public purpose of assuring appropriate public access to the Second Avenue subway is best served by retaining the entrance at 305 East 72nd Street, the re-siting of the entrance does not meet the public purpose requirement of the EDPL.

351.    Upon information and belief, the Design Change, if permitted to occur, would cause massive restrictions and dislocations throughout the construction period at and in front of Plaintiff 315 and Plaintiff 325, constituting a compensable temporary taking for a period of at least four years.

352.    Because both the 306 Easement Premises and 305 East 72nd Street are readily available to provide public access to the Second Avenue Subway, it is not necessary to take the property of Plaintiffs in order to achieve the public purpose, and it is palpably unreasonable to do so.

353.    Therefore, the proposed acquisition of Plaintiffs' property, which is located more than 200 feet away from the eastern side of the bed of the Second Avenue Subway, is not supported by a public purpose and constitutes excess condemnation.

<u>COUNT IV</u>
(Violation of EDPL § 204(B)(2) / Inadequate Determination and Findings)

354.    Plaintiffs respectfully reallege Paragraphs 1 to 353 of this Complaint as if stated fully herein.

355.    Pursuant to EDPL Section 204(B) (2), "The condemnor, in its determination and findings, shall specify . . . the approximate location for the proposed public project and the reasons for the selection of that location."

356.    Removal of the subway entrance from the corner of East 72nd Street and Second Avenue to the middle of block on East 72nd Street between Second Avenue and First

Avenue is not a change in "the approximate location for the proposed public project"; it is a re-siting that required notice and consideration at a public hearing.

357. Because no hearing regarding the drastically relocated subway entrance has ever been held in conformity with the public hearing requirements of the EDPL, and because the Determination does not even purport to give reasons for the selection of the relocated subway entrance, the "Determination" fails to meet the requirements of the EDPL, and it is illegal, and must be nullified.

<u>COUNT V</u>
(Violation of EDPL § 204(B)(3) / Improper SEQRA review)

358. Plaintiffs respectfully reallege Paragraphs 1 to 357 of this Complaint as if stated fully herein.

359. The purpose of the eminent domain procedure in New York is to "inform the public and to review the public use to be served by a proposed public project and the impact on the environment and residents of the locality where such project will be constructed." E.D.P.L. § 201.

360. Where a condemning agency's decision-making regarding acquisition is inconsistent with its duties pursuant to SEQRA, it will be subject to subsequent judicial review. <u>Id</u>. § 207(c)(3).

361. The Design Change proposes numerous and substantial modifications to the location and nature of the north entrance on 72nd Street east of 2nd Avenue. These substantial modifications involve significant potentially adverse impacts upon Plaintiffs' properties.

362. As such, Defendants were required to evaluate the Design Change during their condemnation proceedings to determine whether the modifications presented significant adverse impacts not addressed in the FEIS.

363.    Defendants' failure to supplement the FEIS to include the significant changes to the Project pursuant to SEQRA violates the procedures and duties placed upon a condemning agency pursuant to EDPL, Section 204(1).

<u>COUNT VI</u>
(Tax Payers Action / Violation of GML Section 51)

364.    Plaintiffs respectfully reallege Paragraphs 1 to 363 of this Complaint as if stated fully herein.

365.    Plaintiffs bring this cause of action against Defendants for injunctive relief pursuant to New York General Municipal Law Section 51, to enjoin them from expending public funds to acquire property rights through condemnation or negotiation to construct entrances to the proposed Second Avenue Subway east of the eastern street line of 2nd Avenue on East 72nd Street, including its sidewalks and building fronts, other than through use of the existing Transit Easement for such entrances located within the 306 Easement Premises.

366.    The Easement Premises is located within the Special Transit Land Use District for the stated purpose of allowing the construction and maintenance of staircases and elevators for pedestrian ingress and egress between East 72nd Street or Second Avenue and the proposed Second Avenue Subway.

367.    On information and belief, Defendants have chosen not to provide public access to the subway through the easement located in the 306 Easement Premises, deciding to pursue significantly more costly alternatives.

368.    Plaintiffs therefore demand judgment enjoining defendant from expending any public funds to obtain any property interest east of the eastern boundary of the proposed subway bed of the Second Avenue subway, or adjacent to  East 72nd Street, including, its sidewalks and building fronts, other than to provide public access to the subway through the

Easement Space, and declaring that the grant of permission to Owner for temporary possession

of the Easement Space terminates six months after the entry of judgment herein.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request judgment against Defendants,

jointly and severally, and seek the following declaratory and equitable relief:

i.    declaring that Defendants' purported final determination to adopt the Station Relocation without preparing a Supplemental Environmental Impact Statement is in violation of NEPA and SEQRA and their implementing regulations;

ii.   compelling Defendants to correct their NEPA and SEQRA deficiencies by, <u>inter alia,</u> preparing a Supplemental Environmental Impact Statement to study the potential significant environmental impacts of the proposed Station Relocation, as well as other new circumstances and/or information relevant to environmental concerns implicated by said action;

iii.  enjoining any and all actions in furtherance of the Station Relocation, as well as so much of the Second Avenue Subway Project that depends upon or is linked to the construction or ultimate location of the mid-block, sidewalk station entrances adopted under the Station Relocation, unless and until Defendants comply with NEPA and SEQRA, and their implementing regulations;

iv.   declaring that Defendants' proposed acquisition of Plaintiffs' and others' property interests relating to the Station Relocation, including, Plaintiffs' vaults and canopies, is not supported by a public purpose, and constitutes excessive condemnation under the EDPL;

v.    declaring void Defendants' Determination and Findings as in violation of the EDPL for failing to prepare a Supplemental Environmental Impact Statement under SEQRA;

vi.   enjoining Defendants from expending any public funds and condemning any property interests relating to the 72nd Street Station for the Second Avenue Subway Project that would irrevocably commit Defendants to implementing the Station Relocation, unless and until Defendants comply with the EDPL and SEQRA;

vii.  declaring that Defendants' proposed acquisition of certain property interests relating to the Station Relocation would be a waste of taxpayers monies under GML Section 51, and enjoining Defendants from expending

public funds to obtain any such property interests through condemnation; and

viii.    declaring that the NYCT Transit Easement is immediately available to the MTA for its potential use for a station entrance for the Second Avenue Subway Project.

Dated:  February 4, 2008
       White Plains, New York

Respectfully submitted,

ZARIN & STEINMETZ

By: _____

Michael D. Zarin (MDZ-6692)
Counsel for Plaintiff  325 East 72nd Street Corp.
81 Main Street, Suite 415
White Plains, New York 10601
(914) 682-7800

ANDERSON KILL & OLICK, P.C.

By: _____

Jeffrey E. Glen (JG-8277)
Counsel for Plaintiff  315 East 72nd Street Owners Corp.
1251 Avenue of the Americas
New York, New York 10020
(212) 278-1000